STANDARD WOOD CO. v. HALL, GARDNER & CO. et al.

(Circuit Court of Appeals, Third Circuit. January 9, 1917.)

No. 2135.

SALES ⚙═98, 107—CONSTRUCTION—RIGHT OF RESCISSION FOR BREACH.

Defendant operated a sawmill, and had as a by-product slabs and edgings, which it desired to dispose of, and plaintiff was a manufacturer of kindling wood. The parties entered into a contract, without limitation as to time, by which plaintiff agreed to build a factory of stated capacity at a convenient point, and defendant agreed to deliver at the factory at an agreed price per cord slabs and edgings cut to proper lengths for plaintiff's use. The contract provided that, if the sawmill should be destroyed, it should be promptly rebuilt, and also that on 30 days' notice plaintiff might shut down its factory, and during the suspension of business it should not be required to take and pay for wood, but that, if such shutdown should continue for 90 days, defendant might terminate the contract. The parties had operated under the contract for a number of years, when plaintiff notified defendant that it found it necessary to ship "some of the wood" elsewhere, and requested that "for the present" it be shipped to a paper mill, which was done. Thereupon plaintiff dismantled and tore down its factory. It received from the paper mill a large advance on the price it paid defendant for the wood. After about seven months, learning of the destruction of the factory, defendant gave notice under the forfeiture clause of the contract of its termination and ceased shipments. *Held*, that the suspension and forfeiture provisions of the contract had no application to the situation, but contemplated only temporary suspension of business by plaintiff; that its destruction of its factory was a breach, which went to the whole consideration of the contract, and gave defendant the right to rescind, or to recover damages for the breach; and that its action in stopping shipment was in legal effect an election to rescind.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 263, 276; Dec. Dig. ⚙═98, 107.]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action at law by the Standard Wood Company against Hall, Gardner & Co., a partnership, and James K. Gardner, Jane Hyde Hall Liddell, and Susan E. Hall, surviving partners. Judgment for defendants, and plaintiff brings error. Affirmed.

William A. Stone, of Pittsburgh, Pa., Jones & Wick, of Bradford, Pa., and Stone & Stone, of Pittsburgh, Pa., for plaintiff in error.

J. Rodgers McCreery, of Pittsburgh, Pa., and Eugene H. Baird, of Ridgway, Pa., for defendants in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The plaintiff in error (plaintiff below) is a kindling wood company. The defendants in error (defendants below) compose a partnership doing business as a saw mill company. This action was brought by the kindling wood company for breach of a written contract between them. At the trial two questions were raised. The first, a question of fact, was whether the terms of the con-

tract had been changed by the parties; the second, a question of law, was the construction of the contract, either as changed or unchanged, according to the fact found. The verdict was for the saw mill company, and the kindling wood company brought this writ of error. The specifications of error, in number and scope, cover the whole case, and will therefore be considered under a general review.

The contract is in writing. In the main, there is neither ambiguity in its terms nor uncertainty in its meaning. It appears that in 1898, the year of its date, the saw mill company owned large tracts of land in the Counties of Elk and Forest, in the State of Pennsylvania, from which they proposed to cut hemlock timber and manufacture it at their mill at Hallton. In order to dispose of their slabs and edgings this contract was entered into, and by its terms the saw mill company agreed to sell and the kindling wood company to buy, without limit as to time, all their hemlock slabs and edgings cut in lengths suitable for kindling wood manufacture, delivered at a designated factory of the kindling wood company, at a price of about seventy-five cents per cord, graduated somewhat by varying market conditions. In order to take and consume the slabs and edgings to be delivered under the contract, the kindling wood company agreed to erect and did erect a kindling wood factory of a given capacity at Portland Mills, a suitable location for the economical shipping and handling of the product.

To insure uninterrupted deliveries to its factory and to avoid loss of its investment consequent upon stopping the timber operation, the kindling wood company required, and the saw mill company agreed, that if the saw mill should be destroyed by fire or otherwise, they would promptly rebuild or repair it.

Under the terms of the contract as originally drawn, the parties acted for many years, one satisfactorily disposing of a by-product of little value and the other manufacturing its finished product from a cheap raw material always at hand.

From the terms of the contract the parties seldom deviated and then only by agreement. In 1903, the kindling wood company, upon representations that it was necessary to divert "a certain quantity" of the wood from shipment to its factory at Portland Mills to another of its plants, secured the acquiescence of the saw mill company, and shipments were made elsewhere. After a brief period, the parties returned to the original contract and resumed shipments exclusively to the factory at Portland Mills. Again in 1907, in conversations between the parties and confirmatory correspondence, the parties agreed to depart from the contract with respect to shipments. It appears that an officer of the kindling wood company wrote the saw mill company that:

"We find it necessary to ship out *some of the wood* from Hallton [i. e. to ship wood elsewhere than to its factory at Portland Mills] as the conditions of trade will not permit us to manufacture this."

The conditions referred to were market conditions for kindling wood in the cities, and the fact that there were piled at the kindling wood factory about 5,000 cords of slabs, indicating a large supply on hand. The saw mill company replied by saying:

"Relative to changing the shipment of wood from Portland Mills to other points, would say that it will be entirely satisfactory to us, and we will take great pleasure in billing the stock wherever you designate."

The kindling wood company wrote the saw mill company:

"Referring to the writer's recent interview with Mr. Lockhart relative to shipping out the Hallton wood, we desire to ship this *for the present* to the Hartje Paper Mfg. Co., Steubenville, Ohio, via P. R. R. delivery, and if you will kindly issue the necessary instruction we will appreciate it very much."

Knowing, as it is testified, that the kindling wood company had on hand a large supply of wood, and that the conversations and the correspondence referred to a diversion of shipments not as to *all* but only with respect to *"some of the wood,"* not permanently, but only *"for the present,"* the saw mill company readily subscribed to the change in its temporary character, and made the shipments to the paper company as directed.

During this period, the kindling wood factory was not operated. This was known by all the parties and not objected to. It developed, however, that after about seven months, the saw mill company made inquiry as to when operations were to be resumed and found that the kindling wood plant had been dismantled, the machinery shipped away, and, the larger part of the structure torn down. Thereupon, the saw mill company resorted to what is termed the "forfeiture clause" of the contract, and attempted by notice to terminate the contract pursuant to their understanding of its meaning. This clause is as follows:

"It is further understood and agreed that the party of the second part [kindling wood company] may at any time *shut down* its kindling wood factory, and during *such shut down* or *suspension of business*, the party of the second part shall not be required to take and pay for any slabs or edgings under the terms of this contract, provided, however, that *the party of the second part shall give thirty days' notice* in writing to the parties of the first part *of its intention* to shut down or suspend as aforesaid, and provided further, that if *such* shut down or suspension shall continue for *a period of ninety days*, the parties of the first part [saw mill company] may at their option declare this contract terminated."

With the notice given, shipments were stopped. It is pertinent here to note that so long as hemlock slabs had only a by-product value to one of the parties and only a cheap raw material value to the other, the two moved contentedly along under the contract, but when trade conditions in the paper industry gave hemlock slabs a raw material value for paper far greater than their value for kindling wood, the parties to this contract were subjected, one after the other, to a temptation which they could not withstand. The kindling wood company found that slabs for which it was paying seventy-five cents a cord could be sold to the paper company for three dollars a cord. It therefore stopped the manufacture of slabs into kindling wood, diverted shipments to the paper company, and under the influence of greatly increased profits, did the unwise thing of dismantling and demolishing its kindling wood factory. When the saw mill company found this out they attempted to terminate the contract under the forfeiture clause and did terminate shipments, thereby leaving the kindling wood company without wood with which to carry on its contract with the paper

company.   Being similarly attracted by greater profits, the saw mill company availed themselves of the new demand for hemlock slabs, stepped into the place of the kindling wood company, contracted with the paper company for its needs, and reaped the increased profits for themselves.   These the kindling wood company are endeavoring to recover by this suit.

Manifestly in this situation we are not concerned with business ethics or with hunting for and balancing equities between the parties. We are concerned only with the legal positions of the two parties, both of whom at different periods were keen to be relieved of their contract.

At the trial the court very properly left to the jury the question whether the parties by their correspondence and conduct had (permanently) changed the terms of their contract, when shipments were diverted from the kindling wood factory to the paper company.   It then construed the contract as giving the kindling wood company a right of action or as terminated by the notice of the saw mill company under the forfeiture clause, according as the jury found that the contract had or had not been changed in its terms.

As the jury found for the defendant, they found that the contract had not been changed, and the case comes before us only for a construction of the contract as originally made in connection with three undisputed facts, namely, that the kindling wood company gave no notice of its intention to shut down; that the factory was shut down (in a sense) for a period of ninety days before the notice of the saw mill company terminating the contract, and that by that time, the kindling wood company had completely dismantled and partially demolished its factory.   The question involved in the construction is, whether the contract was terminated, and if so, how and by which party was it terminated.

The kindling wood company maintains that the contract was not terminated, except by the breach of the saw mill company in stopping shipments, for which it brings this action.   Its contention is, that the notice by the saw mill company to terminate the contract, given under the forfeiture clause, was ineffective because it was not given in the situation contemplated by that clause; that under a proper interpretation of that clause, the saw mill company's right to terminate the contract accrued only after a ninety day shut down *following* a thirty-day notice by the kindling wood company of its intention to shut down, when seeking to relieve itself of liability to take and pay for slabs, and that the kindling wood company could shut down at any time it chose for as long as it chose, if it gave no thirty-day notice of such intention, and if it continued to take the slabs and pay for them.   As no such thirty-day notice of intention to shut down was given, it maintains that the saw mill company's notice to terminate the contract was improvidently made, and that the contract remained in force until breach by the saw mill company in refusing to continue shipments.

In determining whether the contract was terminated, and if terminated, then how and by whom, we must first construe the forfeiture clause.   It is clear from the business of the parties, their reasons for

entering into the contract, its duration without limit, and the mutuality of its terms, that the kindling wood company demanded raw material for its kindling wood factory in a flow not to be ended even by the burning of the saw mill, and only to be interrupted while a new mill was being built; and that the saw mill company, to insure the consumption of a by-product, required that there be built at a point in touch with its timber operations a kindling wood factory of an agreed capacity to take the flow of its material in continuous movement, except when in the nature of things a shut down or suspension became necessary. Such a shut down is provided for in the forfeiture clause, and such a shut down is permitted without liability on the part of the kindling wood company to take and pay for the slabs if it theretofore gives a thirty-day notice of its intention to shut down, with a reciprocal right to the saw mill company to terminate the contract if the shut down lasts ninety days after notice. It is plain from its terms, that when the parties entered into the contract they contemplated nothing other than the shipment of slabs exclusively to the kindling wood factory at Portland Mills. This is shown by the way the parties themselves interpreted the contract, for in the two instances in which they deviated from its terms by making shipments elsewhere, they first agreed upon the change of shipment, in one instance returning to the contract and resuming operations under its original terms, and in the other, pursuing a practice which resulted in this suit and a finding by the jury that they did not permanently change its terms. As the contract did not contemplate shipments elsewhere than to the factory at Portland Mills, and therefore did not contemplate the loss of a consuming plant by sale and speculation in the slabs, the shut down provided for in the forfeiture clause clearly meant a temporary shut down or suspension, with certain rights moving to each party therefrom.

Such was the situation contemplated by the forfeiture clause, but such is not the situation we find in the evidence. It is conceded that it was known that the kindling wood factory was not being operated. Cessation of operation normally constitutes a shut down, or suspension of business. But the kindling wood company did more than this. It completely dismantled its factory and tore down a large part of it. This was not a shut down, or a suspension of operations, for in suspension is embodied the idea of resumption at some time. It was an end to operations and the closing of business, in that it was a destruction of the very instrumentality by which alone the kindling wood company could carry on its business and carry out its contract. It also prevented the saw mill company from thereafter performing the contract on their part by making impossible further shipments to the only factory to which by their own interpretation of the contract the parties intended shipments to be made; and it deprived them of the fixed means for the consumption of their product, which was the consideration that moved them to enter into the contract.

We are of opinion that the destruction of the factory was a breach by the kindling wood company going to the whole consideration of the contract, giving the saw mill company, the party injured, the right

to rescind the contract or to recover damages for the breach, Oscar Barnett Foundry Co. v. Crowe, 219 Fed. 450, 455, 135 C. C. A. 162; Kauffman v. Raeder, 108 Fed. 172, 47 C. C. A. 278, 54 L. R. A. 247; Howe v. Howe & Owen Ball Bearing Co., 154 Fed. 820, 83 C. C. A. 536; Neenan v. Otis Elevator Co. (C. C.) 180 Fed. 997, 1000, unless the forfeiture clause or some other clause of the contract provides otherwise.

Does the forfeiture clause, which (in the interpretation of the kindling wood company) provides that one party may terminate the contract only after notice by the other of its intention to shut down, contemplate a continuance of the contract after the factory has been torn down? If it does, then we have the singular construction of the clause, as applied to the facts, that the kindling wood company may "shut down" its factory after it has been torn down, and suspend business after business has been ended, and upon giving "thirty days' notice * * * of its *intention* to shut down" a torn down factory, the kindling wood company is relieved of its obligation to further receive and pay for slabs. Carrying this construction a step further to the reciprocal rights of the saw mill company, we would find that the right of that company to terminate the contract accrues only if the "shut down" continues for ninety days after a thirty day notice by the kindling wood company of its intention to shut down a plant already torn down, and to suspend a business already ended. It is scarcely necessary to pursue this further.

Does the contract make provision elsewhere for its continuance after such an act as the destruction of the factory by the kindling wood company? We find none. Thus we have a contract in which the parties did not agree to the thing done, and the case resolves itself into the usual question, under the familiar rule alluded to, whether the thing done is a breach of the contract as made, and, if so, whether it is a breach that justifies its termination. As the essential facts are undisputed, we must hold, that the destruction of the factory constituted a breach of the contract committed by the kindling wood company; that the breach went to the whole consideration; and that, although the saw mill company proceeded to terminate the contract under rights conceived to be theirs under the forfeiture clause, their action, nevertheless, was in legal effect an election to rescind upon a breach by the other party, and ended the contract.

The judgment below is affirmed.